First National Bank of Freehold *v.* Irons.

---

The First National Bank of Freehold
*v.*
Gilbert H. Irons and others.

Fraud will not be inferred from circumstances which merely indicate unusual generosity.

---

Creditor's bill. On final hearing on pleadings and proofs.

*Mr. W. H. Vredenburgh,* for complainants.

*Mr. J. J. Ely* and *Mr. Joel Parker,* for defendants.

THE CHANCELLOR.

The complainants, on the 29th of November, 1875, recovered a judgment against the defendant, Gilbert H. Irons, in the supreme court of this state, for $912.55, in an action of assumpsit. They subsequently issued execution thereon against the defendant's goods and lands, which was returned wholly unsatisfied. They thereupon filed their bill of complaint against him and his wife, and William M. Smith and Royal L. Wolcott, to subject to the payment of their judgment certain goods and chattels which, they allege, belong to Irons, but which, at the filing of the bill, were in the hands of his wife or of the other defendants, or one of them. The complainants' debt was contracted by Irons, between the 8th of December, 1874, and the 13th of February following, and was for money lent by them to him in discounting notes for him in the regular course of their banking business. Irons then was the keeper of a country store at Smithburgh, a village in the county of Monmouth. His store was in a building owned by the defendant, Smith, whose tenant he was, and had been since April 1st, 1874. On the 23d of February, 1875, Irons sold to Smith what is called, in the testimony, his "outside property," consisting of two horses, a small carriage, three wagons, a sulky, two sets of single harness and a set of a double harness, a cow, a lot of marl (12,983 bushels), and a lot of pine boards, for the consideration of $1,965.56. Two days afterwards he sold to Smith his entire stock of goods and his store fixtures for $1,800. Smith, from that time, carried on the business of the store himself, until the 3d of April following, when he sold the goods then in the store, and the fixtures, to the defendant, Wolcott, for $2,100. The latter carried on the business, employing Irons as his clerk, until the 8th of May following, when he transferred the stock and fixtures to Irons's wife, and the business has since then been carried on in her name by her husband.

The complainants insist that both of the transfers made to Smith were fraudulent, and designed to protect the

property from the creditors of Irons, who was then insolvent. It appears that Irons was, indeed, indebted to a very considerable amount at that time, much beyond his ability to pay. Judgments to the amount of $1,747 were subsequently recovered against him for debts then existing, including that of the complainants. But while it is true that such was the condition of Irons's affairs, it does not appear that Smith was in any wise aware of it. On the other hand, he swears (and he is not contradicted) that he had endorsed for Irons twice, but was not acquainted with his business; that Irons seemed to be " going along very nicely," as far as he knew; that he supposes Irons met the paper which he had endorsed for him, since he never heard from it afterwards; that he bought the property sold to him on the 23d of February, in order to assist Irons; that the latter told him he was somewhat in debt, but had property enough to pay three dollars for every one which he owed, but had " got his stock into marl and boards so much that it cramped him up, and if he could get any one to take them off his hands he could go ahead, and have $600 ahead in bank, and could go right along." The evidence is, that Smith paid a fair price for all the goods he bought at the sale. Irons and he disagreed as to the value of the horses, and the matter was referred to one John C. Lefferson, by whom the price was fixed. He paid for the property $1,956.56, of which $391.32 were paid in cash at the time of sale, and for $1,200 of the price he then gave him his note, payable at the complainants' banking house in three months from its date. When that note matured, he paid $600 of its amount, and gave his note for the balance, payable in three months, which he paid when it fell due. He paid the balance of the price by paying off for Irons two of the latter's notes, one held by Lefferson, for $200, and the other by R. S. Strickland, for $174.24. The note for $1,200 was discounted by the complainants for Irons (the next day after it was given, it would seem from the evidence), and the proceeds were immediately applied by them to paper

which they held, on which he was liable to them. Some of it had matured, and some was not yet due. He then again went to Smith, and, as the latter says, told him that he was in as much trouble as before ; that he had gone to Freehold to " deposit " the note and some money, and that the president of the bank " had gone back on him." On Smith's asking him what the president had done, he pulled out some papers, and said the president had " charged up paper ; some that was due, and some that was not due, till he swallowed up all the money he had taken down ;" and, he added, that he did not know what he was to do ; that the president, contrary to his promises, would not discount his paper any more ; that his store was run down, and that if they would not discount his paper he wanted to get out of the business, and wished to sell out and settle up ; that he had paper enough to pay two dollars for every one he owed, but if he could not obtain discounts he could not fill up his store. He asked Smith to buy the stock and fixtures. The latter hesitated, and held the matter under consideration for a day, and then concluded to purchase them, and did so on the 25th of February.

It appears that the stock and fixtures were carefully inventoried and appraised by two impartial appraisers. The prices seem to have been fair. The inventory and appraisement were attached to the bill of sale. The amount of the appraisement was $1,830. Smith, objecting that some of the goods would not sell for the price at which they had been appraised, offered $1,800 for the stock and fixtures, in three equal instalments, at three, six, and nine months, for which he would give two notes. The proposition was accepted, and the sale was made and the notes were given.

Smith says that he would not have bought the goods if the store had not been in his own building ; that, when he purchased, he expected to keep the store himself, and did not expect to let Irons or his wife have it; and that there was no agreement that they should have it again. He did, in fact, carry on the business in the store in his own name

for five weeks, employing a clerk who had been in the employ of Irons there. He added to the store, in that time, stock to the value of $300, besides supplying the place of what was sold by retail. He sold the stock and fixtures to the defendant, Wolcott, on the 3d of March following, for $2,100, of which $300 were paid in cash and the balance by the return to him of two notes for $1,800 given to Irons, but by the latter transferred to Charles Allen, who then held them. These were the notes given by Smith to Irons, on account of the price of the stock and fixtures. Soon after receiving them from Smith, Irons transferred them to Allen, as consideration for the conveyance by the latter, as executor, to him, of a small farm (on which was a dwelling house) in Pennsylvania. When Wolcott (who was a friend of Irons) applied to Smith to purchase the stock and fixtures, the latter fixed the price at $2,000. The former agreed to purchase them at that price, and offered to pay $600 of the purchase money in cash, and to give his notes, payable in fifteen days at his office in the city of New York, for the balance. Smith declined to take the notes, and Wolcott then enquired if he would accept the notes held by Allen. Smith agreed to do so, and Wolcott purchased the notes of Allen at their face value, after deducting discount, and paid him in cash $300, and gave him his note for the balance, about $1,400, which, in a few weeks afterwards, he paid to him in cash in the city of New York. On the 8th of May following, Wolcott, who from the time of the purchase had carried on the business in his own name, employing Irons as his clerk, transferred the property to Mrs. Irons. The bill of sale from him to her for it, expressed, as consideration, the sum of one dollar and his good will and friendship towards and for her. The farm which was conveyed by Allen to Irons, was afterwards reconveyed by the latter to the former for the consideration of $1,536.36, which was made up and paid by notes, amounting with interest, to $1,417.34, given by Irons, and outstanding, which had been bought up by Allen, and the

amount, $119.02, of a note endorsed by Allen for Irons, and paid by the former.

In the transactions above detailed, there is nothing to implicate either Smith or Wolcott in any design to protect from the creditors of Irons, the property transferred to them. Both paid a fair price for the property purchased. The money paid by Smith on the first purchase, was at once applied to the payment of Irons's debts, except a small amount used in the support of Irons's family. That which was paid on the second purchase, appears also to have been fully applied in like manner. Smith knew, indeed, that Irons was embarrassed, and was desirous of selling his property, but he does not appear to have been actuated by any design to cover up or protect the property from Irons's creditors. That Irons did not tell him the truth in regard to his financial condition, is a fact of no importance. As to Wolcott, he seems to have been actuated by motives of friendship merely. He paid the purchase money of the stock and fixtures with his own funds, and it appears that he was abundantly able to do so generous an act as that which he claims to have done in this instance. He was the owner of unincumbered property to the value of about $75,000, and had from his business (the sale of patent medicines of which he was the proprietor) an income of about $10,000 a year. Between him and his wife, and Irons and his wife, there was a close intimacy of long standing. Irons had materially assisted him in bringing his medicines to popular notice, and so in laying the foundation of his fortune. They visited each other regularly at stated times. After Irons had sold out the store to Smith, Wolcott came to see him, and found Mrs. Irons confined to her bed by severe illness, and her husband without means of supporting the family, which included their four little children. Wolcott was desirous of assisting them to the means of a livelihood, and expressed his intention to buy the store and give it to Mrs. Irons, in case she should recover. He executed his design. The bill of sale from him to Mrs. Irons contains

evidence of the fairness of his conduct. It expresses its consideration truly. In the whole transaction there appears no evidence of any attempt at concealment, nor of any illegitimate or sinister purpose on his part. The complainants' case, as to him, rests wholly on a suspicion which owes its origin to incredulousness of the existence of a friendship which could bestow, even though it be out of its abundance, so large a gift upon a destitute and suffering family. Such friendship is rare, indeed, but happily it is not so rare as to challenge absolute disbelief of its existence. Wolcott swears that he paid the money to Allen, and the latter corroborates his statement. He swears that it was his own money, in no wise derived from Irons or his property, and that it has never been repaid. He has answered fully and satisfactorily all the interrogatories which, by the bill, he was required to answer on oath. He is not impeached or contradicted in any way. Smith, too, stands wholly uncontradicted and unimpeached.

The bill will be dismissed, with costs.